IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF CELLULAR TELEPHONES DESCRIBED AS:** )<br>)<br>)<br>**AN IPHONE LABELED AS ITEM 4,** )<br>)<br>**AN IPHONE LABELED AS ITEM 5, AND** )<br>)<br>**AN ANDROID PHONE LABELED AS ITEM 6** )<br>)<br>)<br>**CURRENTLY LOCATED AT THE LYNCHBURG POLICE DEPARTMENT IN LYNCHBURG, VIRGINIA AND STORED UNDER CASE NUMBER 2020-14487** )<br>)<br>)<br>)<br>) | Case No. 6:20mj29 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Daniel Bailey, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a certain electronic device, more fully described below and in Attachment A, which is currently in law enforcement possession, and the extraction from this device of electronically stored information described more fully herein and in Attachment B.

2. I am a Task Force Officer with the Drug Enforcement Administration (DEA) and have been since 2017. I am also a Detective with the Lynchburg Police Department (Virginia) and be been so employed since 2002. I am currently assigned to investigate drug trafficking organizations as a member of the DEA, Washington Field Division/Roanoke Resident Office.

My duties as a Task Force Officer involve the investigation of various criminal activities of narcotics traffickers and their associates.  In investigating these matters, I have acted as a case agent, an undercover agent, and a contact agent for confidential sources.  These investigations have resulted in the issuance of federal search warrants, seizure warrants, indictments, and convictions of persons for federal narcotics violations.  During my employment as a law enforcement officer, I have received multiple hours of training in narcotics enforcement and investigative techniques, and I have personally participated in numerous investigations.  I have also spoken on numerous occasions with informants, suspects, and other experienced narcotics traffickers concerning the methods and practices of drug traffickers, including the methods and practices used by traffickers of methamphetamine, heroin, and cocaine. I have been involved in the execution of numerous search warrants on electronic devices, including cellphones, and in obtaining location information for those devices.

      3.      Based on my training and experience investigating narcotics and the distribution of narcotics, I know that it is common for individuals engaged in this activity to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities. I know that "smart" phones play an integral role in the daily lives of individuals engaging in narcotics trafficking and that these individuals use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and telephone conversations. I also know that it is common for narcotics trafficker to use multiple "smart" phones to communicate with co-conspirators in order to compartmentalize their illegal activity and avoid detection by law enforcement. Further, I know it is common for narcotics traffickers to change their phones and phone numbers in order to avoid detection by law enforcement.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched is as follows:

   a. An iPhone (hereinafter, the "Target Cell Phone #1"), stored at the Lynchburg Police Department's evidence storage under case number 2020-14487 as Item 4.

   b. An iPhone (hereinafter, the "Target Cell Phone #2"), stored at the Lynchburg Police Department's evidence storage under case number 2020-14487 as Item 5.

   c. An Android (hereinafter, the "Target Cell Phone #3"), stored at the Lynchburg Police Department's evidence storage under case number 2020-14487 as Item 6 (collectively, the "Target Devices").

## STATEMENT OF PROBABLE CAUSE

6. The United States, including the Drug Enforcement Administration, Bureau of Alcohol, Tobacco, and Firearms (ATF), Virginia State Police, and the Lynchburg Police Department (LPD), is conducting a criminal investigation of Warren BROGGIN ("BROGGIN") and others regarding violations of distribution and possession with intent to distribute cocaine, heroin, and methamphetamine in violation of 21 U.S.C. § 841(a)(1) and conspiracy to distribute cocaine, heroin, and methamphetamine in violation of 21 U.S.C. § 846.

7. In November of 2019, law enforcement interviewed BROGGIN after advising him of his *Miranda* rights. BROGGIN told law enforcement that BROGGIN was a multi-ounce distributor of cocaine HCL.

8. In or about January of 2020, law enforcement received information from a Confidential Source (CS-1) that BROGGIN was selling heroin. Between the dates of January 8,

3

2020 and February 21, 2020, the LPD used CS-1 to make approximately six controlled purchases of heroin from BROGGIN. CS-1 was paid for each controlled purchase that CS-1 made for on behalf of law enforcement. The substances obtained during the controlled purchases were sent to the Virginia Department of Forensic Science. The substances were tested and confirmed to be heroin and totaled approximately 99 grams of heroin. During approximately three of those controlled purchases, the CS-1 communicated with BROGGIN, via the phone number later discovered to be used by **Target Cell Phone #1**, to facilitate those controlled purchases. Those controlled purchases occurred in the Western District of Virginia.

9.     In February of 2020, law enforcement conducted an interview of a Source of Information (SOI-1). SOI-1 was in custody for a narcotics violation that occurred in the Western District of Virginia. SOI-1 made inculpatory statements about SOI-1's involvement in illegal narcotics distribution. During that interview, SOI-1 identified BROGGIN as a source of supply for heroin. SOI-1 advised that SOI-1 began purchasing heroin from BROGGIN in 2018. SOI-1 advised BROGGIN attempted to sell SOI-1 methamphetamine.

10.    In July of 2020, law enforcement spoke with CS-1. CS-1 advised that BROGGIN was still utilizing the number for **Target Cell Phone #1** to facilitate drug sales. CS-1 advised that BROGGIN stated that BROGGIN was selling heroin and methamphetamine. BROGGIN provided the CS-1 prices for each narcotic that BROGGIN was selling.

11.    In August of 2020, law enforcement received information from a Confidential Source (CS-2) that BROGGIN was selling cocaine HCL and methamphetamine. CS-2 advised law enforcement that BROGGIN was utilizing the number for **Target Cell Phone #1** to facilitate drug sales.

12.     In August of 2020, law enforcement used CS-2 to make a controlled purchase of approximately twenty-nine grams of cocaine HCL from BROGGIN. During that controlled purchase, CS-2 communicated with BROGGIN, via the number for **Target Cell Phone #1**, to organize the controlled purchase.  That controlled purchased took place in the Western District of Virginia. CS-2 was paid by law enforcement to conduct that controlled purchase.

13.     In August of 2020, law enforcement used CS-2 to make a controlled purchase of approximately 57 grams of methamphetamine from BROGGIN. During that controlled purchase, CS-2 communicated with BROGGIN, via the number for **Target Cell Phone #1**, to organize the controlled purchase. That controlled purchase took place in the Western District of Virginia. CS-2 was paid by law enforcement to conduct that controlled purchase.

### Monitoring the BROGGIN's Location

14.     In October of 2020, law enforcement served an Administrative Subpoena on Sprint for subscriber information and phone toll record history for the number for **Target Cell Phone #1**. The subpoena results have shown that the subscriber for the number for **Target Cell Phone #1** is "Basa Cab" and a billing address of "618 Newberne Street, Lynchburg Va 24501." Also, based on the data obtained, this affiant determined that the number for **Target Cell Phone #1** was established on February 8, 2020 and was still active as of October 2, 2020.

15.     On October 6, 2020, law enforcement executed a federal search warrant (6:20-MJ-27) on the Sprint Corporation authorizing the tracking of geo-location data of the number for **Target Cell Phone #1**. This warrant was obtained through the Honorable United States Magistrate Judge Robert Ballou in the Western District of Virginia.

16.     Between October 11, 2020 through October 13, 2020, law enforcement monitored the geo-location data of the number for **Target Cell Phone #1**. Based on that analysis, the

5

number for **Target Cell Phone #1** travelled from Lynchburg, Virginia to New York, New York and back to central Virginia. Through actual surveillance, law enforcement was able to locate a rental vehicle travelling in a route that mirrored the geo-location data. Law enforcement determined that the renter of that vehicle was Candice ROBERTSON of 613 Cork Street, Lynchburg VA. Law enforcement had previously seen vehicles known to be used by BROGGIN at that address within, approximately, the last sixty days.

17.    During that surveillance, law enforcement conducted a traffic stop on that vehicle for a moving infraction. BROGGIN and Candice ROBERTSON were identified as occupants of the vehicle. A Lynchburg Police K-9 was deployed to conduct a free air sniff of the vehicle during the course of the traffic stop and alerted to the presence of the odor of narcotics. A search of the vehicle was then conducted and yielded a scale and a bag containing multiple empty capsules. TFO Bailey knew those capsules to be commonly used to package narcotics for distribution. No other contraband was located in the vehicle and the occupants were released without any charges.

18.    On October 14, 2020, BROGGIN was indicted by a federal grand jury, in the Western District of Virginia, in a nine-count indictment (6:20-CR-14) for the violation of multiple federal drug laws.

19.    Between October 20, 2020 through October 22, 2020, law enforcement monitored the geo-location data of the number for **Target Cell Phone #1**. Based on that analysis, the number for **Target Cell Phone #1** travelled from Lynchburg, Virginia to New York, New York and back to central Virginia. During that timeframe, law enforcement received a notification that a vehicle registered to BROGGIN had travelled through a point that coincided with the geo-location of the number for **Target Cell Phone #1**.

20. On October 22, 2020, law enforcement conducted actual surveillance and located the vehicle as it was travelling south towards Lynchburg, Virginia. Law enforcement conducted a traffic stop on the vehicle and identified ROBERTSON as the driver and BROGGIN as an occupant sitting in the front passenger's seat. BROGGIN was placed under arrest for the outstanding federal indictment.

### Recovery of the Target Devices

21. During the course of the traffic stop a free air search was conducted by a Lynchburg Police narcotic detection K-9. The result of that free air search was a positive alert for the odor of narcotics. A search of the vehicle was then conducted. **Target Cell Phone #3** was found on the seat where ROBERTSON was sitting. BROGGIN was found in possession of **Target Cell Phone #2**. **Target Cell Phone #1** was found on the seat that BROGGIN was sitting in. Law enforcement called the telephone number for which they had previously obtained a geo-location warrant and for which BROGGIN had used to conduct drug transactions and determined that this number was the number for **Target Cell Phone #1**.

22. During the search of the vehicle, law enforcement also located a firearm in the driver's side door and a corresponding magazine in the glove compartment.

23. A search of BROGGIN's person was also conducted. During that search, a plastic bag was located in the buttocks area of BROGGIN. That plastic bag contained approximately three plastic bags. Those bags contained a distributable amount of what appeared to be cocaine HCL, crack cocaine, and heroin.

24. I know from training and experience that drug distributors often use cellular phones to arrange drug deals by using the calling feature, text message feature, or a communication-based application and as set forth above, and as explained above law

enforcement has specific information that BROGGIN used a telephone to conduct drug deals. An analysis of call patterns can identify other drug dealers. Photographs or videos found on cellular telephones often show contraband, or locations where contraband may be found. Contact numbers stored in cellular telephone(s) may identify other drug distributors or associates. I know from training and experience that persons who distribute illegal narcotics often use multiple phones to hide evidence of their crimes from law enforcement and often subscribe them in fictitious names. And here, examining further identifiers on the phones could prove BROGGIN's identity as a source of supply. All told, significant evidence of criminal activity can be found within cellular telephones found in the possession of a drug dealer.

25. I also know that cellular telephones store location information, including the whereabouts of the user. Here, examining the Target Devices is likely to reveal information related to the movements and schedule of BROGGIN and ROBERSTON related to drug trafficking activity.

## TECHNICAL TERMS

26. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. *Wireless telephone:* A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless

telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. *Digital camera:* A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player:* A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS:* A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA:* A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash

      memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

  f. *Tablet:* A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

  g. *Pager:* A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

  h. *IP Address:* An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  i. *Internet:* The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

27. Based on my training, experience, and research, I know that the devices described in Attachment A have capabilities that allow them to serve as a wireless telephone, phone book, digital camera, digital recorder, GPS Navigation, portable media player, and PDA. In my

training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

28. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.

29. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a

11

dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

30. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it contains evidence described by the warrant.

31. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the devices described in Attachment A, in order to seek the items described in Attachment B.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

*s/Daniel Bailey*
Daniel Bailey, Task Force Officer
Drug Enforcement Administration

Received by reliable electronic means and sworn and attested to by telephone on this 27th day of October 2020.

*Robert S. Ballou*
ROBERT S. BALLOU
UNITED STATES MAGISTRATE JUDGE